# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| BULK TRANSPORT CORP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 21-cv-399 |
| | ) |
| TEAMSTERS UNION NO. 142 PENSION | ) |
| FUND and TRUSTEES OF THE TEAMSTERS | ) |
| UNION NO. 142 PENSION FUND, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff Bulk Transport Corp ("Bulk"), for a cause of action against Defendants Teamsters Union Local No. 142 Pension Fund ("Fund") and Trustees of the Teamsters Union No. 142 Pension Fund ("Trustees") (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1. This is an action to modify and/or vacate an arbitration award issued under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1401(b)(2).

2. Federal labor law prohibits the payment or any money or thing of value by an employer to any representative of its employees or to any labor organization. 29 U.S.C. § 186(a).

3. An exception to this prohibition allows payments by an employer to trust funds for the sole and exclusive benefit of the employees of such employer, and their families and dependents. 29 U.S.C. § 186(c)(5).

1

4. In order for this exception to apply, *inter alia* the detailed basis on which such payments are made must be specified in a written agreement with the employer. 29 U.S.C. § 186(c)(5)(B).

5. In *Bulk Transport Corp. and Teamsters Union No. 142 Pension Fund*, Case No. 51-621-01343-12 ("the Arbitration"), Arbitrator Ira F. Jaffe ("the Arbitrator") incorrectly concluded that a collective bargaining agreement that expressly limited the scope of its coverage to exclude "commodities hauling work" nonetheless provided the requisite detailed basis obligating Bulk to make pension contributions for commodities hauling work.

6. The Arbitrator's decision is erroneous as a matter of law because it contradicts the foregoing fundamental precept of labor law – namely, that no employer may make contributions to a pension fund unless such contributions are made in accordance with a written agreement specifying the detailed basis on which such contributions are to be made.

7. Contrary to the Arbitrator's decision, an agreement that on its face specifically excludes "commodities hauling" cannot provide the detailed basis for contributions made for such work. Accordingly, in this action, Bulk seeks an order vacating the Arbitration award.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 29 U.S.C. § 1401(b)(2) and 29 U.S.C. § 1451(c).

9. Venue lies in this Court under 29 U.S.C. § 1401(b)(2) and 29 U.S.C. § 1451(d) as the Fund's offices are located at 1300 Clark Road, Gary, Lake County, Indiana, and the Fund is administered at that address, which is in this district.

10. Upon information and belief, in their official capacity, the Trustees administer the Fund at 1300 Clark Road, Gary, Lake County, Indiana, and/or reside, do business or may be found in this district.

11. This action is timely filed under 29 U.S.C. § 1401(b)(2) and 29 U.S.C. § 1451(a), within 30 days after completion of the arbitration proceedings and issuance of the Arbitrator's final award, dated November 24, 2021.

## PARTIES

12. Bulk is a domestic for-profit corporation organized under the laws of the State of Indiana, and is located at 720 W. US 20, Michigan City, Indiana.

13. Bulk is an "employer" within the meaning of 29 U.S.C. § 1451(a)(1).

14. The Fund is an "employee pension benefit plan" as defined in 29 U.S.C. § 1002(2)(A).

15. The Fund is a multi-employer plan within the meaning of 29 U.S.C. § 1002(37) and 29 U.S.C. § 1301(a)(3).

16. The Fund was established and is maintained by employers engaged in commerce or in an industry affecting commerce and by an employee organization representing employees engaged in commerce or in any industry affecting commerce within the meaning of 29 U.S.C. § 1003(a).

17. The Trustees administer the Fund at 1300 Clark Road, Gary, Lake County, Indiana, and employers and employees are equally represented in the administration of the Fund.

18. The Trustees are fiduciaries of the Fund within the meaning of 29 U.S.C. § 1002(21)(A) and are the plan sponsor of the Fund within the meaning of 29 U.S.C. § 1301(a)(10).

## BACKGROUND

### Bulk's Relationship with Local 142

19. During the relevant time-period, Bulk was signatory to two separate collective bargaining agreements with Teamsters Local Union No. 142 ("Union"), a Construction Agreement (covering construction work) and a Steel Mill Addendum (covering only "Steel Mill Operation Work," defined to mean "all non-construction work performed by employees of the Employer to fulfill the Employer's contractual obligations to any steel mill.") (hereafter "Steel Mill Addendum").

20. As Bulk had no "commodities hauling" work at the time, during negotiations in 2003, Bulk and the Union specifically agreed to exclude such work from the Steel Mill Addendum.

21. Bulk had pre-existing and ongoing work its drivers performed directly for steel mill customers, and because the negotiations with the Union were bogged down over issues relating solely to other work, Bulk and the Union ultimately agreed to exclude all other work (such as commodities hauling), from the Steel Mill Addendum.

22. The Steel Mill Addendum expressed this limitation in its first paragraph, in bold underlined letters, stating it would apply to "**<u>Steel Mill Operation Work only</u>**."

23. The Steel Mill Addendum defined "steel mill operation work" as all non-construction driving "performed by Employees of the Employer to fulfill the Employer's contractual obligations to any steel mill."

24. Bulk and the Union executed the Steel Mill Addendum in October 2003.

25. Thereafter, although Bulk attempted several times to negotiate a contract to cover commodities hauling work, the Union refused to negotiate a contract covering commodities hauling.

The LISCO Work

26. In 2004, Bulk entered into a contract with the Levy Indiana Slag Company ("LISCO") to perform a job involving commodities hauling ("the LISCO work.").

27. LISCO was not a steel mill.

28. Thus, the LISCO work performed by Bulk was not performed to fulfill any contractual obligation of Bulk to any steel mill.

29. The LISCO work had previously been performed by another entity, NACA Trucking.

30. Bulk is not affiliated with NACA Trucking in any way. NACA Trucking had its own owners, equipment, facilities and location, and had no relationship with Bulk.

31. Bulk did not engage in any transaction whatsoever with NACA Trucking. Bulk did not purchase NACA Trucking, or any portion of it. At no time did Bulk did acquire any assets, equipment, facilities, stock, or products of NACA Trucking. At no time did former NACA Trucking employees constitute a majority of Bulk's employees performing the LISCO work.

32. Bulk did not assume any contract NACA Trucking may have had with LISCO. Instead, it negotiated its own contract with LISCO.

33. Bulk began performing the LISCO work on April 17, 2004, and assigned its own existing drivers to perform the noncovered work. In May of 2004, Bulk supplemented its workforce performing the LISCO work by hiring some of the drivers previously employed by NACA Trucking.

34. During this time, Bulk reached out to the Union to negotiate a contract covering the LISCO work, as the Steel Mill Addendum did not cover "commodities hauling."

35. The Union refused to negotiate any agreement to cover "commodities hauling," and instead told Bulk to apply the Steel Mill Addendum to the LISCO work.

36. By June 2004, there was still no contract in place between the Union and Bulk to cover the LISCO work. That month, Bulk wrote the Union and asserted it was a successor to NACA Trucking and would implement terms of employment on July 12, 2004.

37. Shortly after the June 2004 letter, Union officials contacted Bulk to dispute the assertion that Bulk was a successor. Whereas Bulk had counted only new hires, the Union insisted that under successorship law all drivers (including Bulk's own pre-existing drivers) must be taken into account. Based on this, the Union denied that a majority of Bulk's employees were prior NACA employees, and denied that Bulk was a successor.

38. Based on the Union's assertion, and the proper calculation, Bulk agreed with the Union that it was not a successor and did not implement any terms of employment.

39. The Union threatened that if Bulk did not apply the Steel Mill Addendum to the LISCO work, or implemented any other terms and conditions of employment, it would strike. Accordingly, at the Union's insistence, Bulk continued to apply the terms of the Steel Mill Addendum to the LISCO work, even though that agreement expressly excluded such work.

40. Bulk continued objecting to the application of the Steel Mill Addendum to the LISCO work and continued to ask the Union to negotiate a contract covering the commodities hauling that constituted the LISCO work. The Union repeatedly refused, telling Bulk it must abide by the Steel Mill Addendum for the LISCO work.

41. Finally, in approximately August 2005, another union engaged in a strike against The Levy Company. The Union honored the picket lines, which resulted in Bulk losing the LISCO work and ceasing contributions for such work.

42. Nonetheless, according to the Fund, the pension contributions Bulk made for the employees performing the LISCO work "increased dramatically" Bulk's contribution base units in the period during which such contributions were made. Indeed, after Bulk lost the LISCO work due to the strike mentioned in paragraph 41 and its contributions subsequently dipped, the Fund included the contributions for the LISCO work in its calculation of contribution base units.

43. Those artificially inflated "high years" of contributions served as the basis for the Defendants' later assertion that Bulk had triggered a series of "partial withdrawals" pursuant to 29 U.S.C. § 1385.

## The Assessments and Arbitration

44. Years later, in or around February 2012, the Defendants issued Bulk three assessments for partial withdrawal liability for the years 2009, 2010 and 2011. The amounts assessed were as follows: 2009 - $954,355.00; 2010 - $30,393.00; and 2011 - $951,937.00.

45. On May 15, 2012, Bulk filed a timely request for review challenging those assessments and timely initiated arbitration on November 9, 2012.

46. In response, on November 21, 2012, the Defendants canceled the 2009 assessment and issued three revised assessments for partial withdrawal liability for the years 2010, 2011 and 2012, in the following amounts: 2010 - $924,061.00; 2011 - $941,553.00; and 2012 - $162,725.00.

47. The parties agreed that the previous arbitration demand would encompass the revised assessments and that there was no need to file a new demand to initiate arbitration.

48. Thereafter, the parties selected the Arbitrator to oversee the matter, and proceeded to arbitrate the three revised assessments.

The Arbitration

49. In the Arbitration, Bulk asserted, *inter alia*, that the contribution base units used by the Fund as a basis for calculating the partial withdrawal assessments were overstated and that, in fact, Bulk had not triggered any partial withdrawal.

50. In essence, Bulk asserted that federal labor law prohibited contributions to the Fund other than those made in accordance with a written agreement, and because the Steel Mill Addendum excluded commodities hauling, contributions made on behalf of drivers who performed the LISCO work could not be counted as contributions for purposes of withdrawal liability.

51. Bulk also raised additional arguments in its requests for review, but to streamline the proceedings, at the outset of the Arbitration, the parties agreed to defer resolution on any additional issues raised and to ask the Arbitrator to rule on the threshold legal question of whether the Steel Mill Addendum covered the LISCO work.

52. At that time, the parties agreed to forego formal discovery until the threshold legal question was decided. The parties reduced their agreement to writing and informed the Arbitrator that they "would benefit from a ruling on the legal issue of whether the Steel Mill Addendum covers the LISCO work performed in 2004-2006 utilized to calculate the withdrawal liability assessment." A true and correct copy of the agreement is attached as Exhibit A.

53. The Arbitrator accepted this proposed procedure and thereafter the parties briefed the agreed upon legal question – whether the Steel Mill Addendum covered the LISCO work.

54. Fifty-three weeks later, on October 3, 2014, the Arbitrator issued an Interim Award ("Interim Award"). A true and correct copy of the Interim Award is attached as Exhibit B.

55. In the Interim Award, the Arbitrator failed to answer the agreed upon legal question – whether the Steel Mill Addendum covered the LISCO work. Instead, ruling on an issue on which

no discovery had been taken, and which the parties had never submitted for decision, the Arbitrator found that Bulk was a so-called "successor" employer to NACA Trucking. Thus, the Interim Award stated that "whether or not the language of the Steel Mill Addendum and/or the Construction Agreement applied to the LISCO work, it is clear that [Bulk] was obligated to make those contributions beginning at least as of the date that [Bulk] became the successor to NACA with respect to that work."

56. On October 22, 2014, Bulk moved for reconsideration, arguing that the Interim Award was an "improvident utterance," as Bulk's supposed status as a successor was never submitted for decision and that neither party had presented evidence or argument on that issue. As to its supposed successor status, Bulk argued that, to the contrary, the Union had asserted at the time that Bulk was *not* a successor, and Bulk had accepted that fact.

57. Bulk also submitted uncontradicted evidence that it was not, in fact, a successor, as former NACA drivers had at no time constituted a majority of its workforce. Moreover, the Fund agreed and admitted that Bulk had never implemented the supposed terms and conditions relied on by the Arbitrator in the Interim Award.

58. Bulk further argued that even if it were a successor, federal law still required a written agreement providing the detailed basis on which any pension contributions must be based. Accordingly, Bulk asserted that the Interim Award was "manifestly incorrect' and requested that the Arbitrator vacate the Interim Award and rule on the threshold legal question agreed to and presented by the parties – whether the Steel Mill Addendum covered the LISCO work.

59. As part of the response to the Interim Award and motion to reconsider, the parties agreed to several stipulations: (1) That the Construction Agreement was not applicable to the LISCO work. (2) The LISCO work was commodities hauling. (3) The Levy Indiana Slag Company

is not a steel mill. (4) Authenticating portions of the Fund's pension plan and trust agreement. A true and correct copy of the parties' stipulations is attached as Exhibit C.

60. On June 19, 2015, the Fund submitted a response, and Bulk submitted a reply brief on September 18, 2015.

61. Almost eighteen months later, on February 23, 2017, the Arbitrator issued a second order, denying Bulk's motion for reconsideration. A true and correct copy of the Arbitrator's February 23, 2017, order is attached as Exhibit D (hereafter "Second Interim Award").

62. In his Second Interim Award, the Arbitrator admitted that in the Interim Award, he had "concluded that it did not matter whether or not the Steel Mill Addendum and/or the Construction Agreement required that [Bulk] make those contributions." (Ex. D., p. 16 of 19)

63. Based on his erroneous finding that Bulk was a supposed successor, the Arbitrator asserted that "the question of whether the Steel Mill Addendum and/or the Construction Agreement also required those contributions did not need to be decided." (Ex. D., p. 17 of 19)

64. Acknowledging that the evidence submitted by Bulk established that it was not a successor, the Arbitrator now asserted that "[w]hile the new information would affect the conclusion that [Bulk] was a successor to NACA, it would not affect the second, independent basis for the Award that the actions of [Bulk] and the Union constituted an adoption by [Bulk] of the Steel Mill Addendum's requirement that contributions be made to the Fund on behalf of the LISCO work." (Ex. D., p. 18 of 19)

65. Thus, the Arbitrator stated in his Second Interim Award that "the obligation to contribute was contained in a written collective bargaining agreement and [Bulk] and the Union, by conduct, agreed to abide by the provisions of that agreement notwithstanding any claims that could otherwise have been made that, absent such adoption, neither the Steel Mill Addendum nor

the Construction Agreement would have required those contributions to have been made." (Ex. D., p. 18 of 19)

66. After this ruling, and as they considered next steps, the parties agreed to keep the Arbitration in abeyance before the Arbitrator.

67. During the period of abeyance, as it had from the beginning, Bulk continued making all required payments of withdrawal liability under the three assessments, and over the course of time paid the full amounts of each assessment.

68. Eventually, the parties agreed to resolve the matter in the following way: they would forego pursuit of certain additional issues, stipulate to certain items, and request the Arbitrator to enter a consent order to bring the Arbitration to completion.

69. Accordingly, as part of an agreed consent order, the parties entered into the following stipulations: (1) Further arguments for contesting the withdrawal liability that had not already been presented in the Arbitration would be waived. (2) The "interim" issue decided by the Arbitrator in his rulings would become final, and that once entered, either party could file to appeal or confirm his rulings. (3) On appeal, the court's determination as to the legal issues (whether affirmed or reversed) would be outcome determinative as to whether Bulk owes the withdrawal liability assessments at issue in the Arbitration. (4) The record on appeal would include the Arbitrator's rulings, the stipulations, the record, briefs and the final consent order. (5) The Arbitration proceedings would be terminated, and each party would bear its own costs and fees.

70. The parties signed, and on November 24, 2021, the Arbitrator entered the consent order as his final order in the Arbitration (hereafter "Consent Order").  A true and correct copy of the Consent Order is attached as Exhibit E.

<u>The Fund's Plan Documents</u>

71. ERISA provides that "Every employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1).

72. The Fund is governed by a Pension Plan and Trust Agreement.

73. The Pension Plan is a written instrument governing the plan within the meaning of 29 U.S.C. § 1102(a)(1).

74. The Trust Agreement is a written instrument governing the plan within the meaning of 29 U.S.C. § 1102(a)(1).

75. Under 29 U.S.C. § 1104(a)(1)(D), the Trustees must administer the Fund "in accordance with the documents and instruments governing the plan[.]"

76. The Fund's Trust Agreement contemplates that the Union and participating employers will enter into "Collective Bargaining Agreements providing that the Employers shall contribute to the Trust specified amounts of money on behalf of employees covered by the said Collective Bargaining Agreement[.]"

77. The Trust Agreement defines "Employee' to mean "any person with respect to whose employment Contributions are obligated to be made to the Trust by an Employer pursuant to a Collective Bargaining Agreement or other written agreement."

78. The Trust Agreement defines "Contributions" to mean "payments made by Employers … to the Trust pursuant to the provisions of a Collective Bargaining Agreement or other written agreement."

79. The Trust Agreement states that "no Contributing Employer shall be liable for any payments to the Trust Fund other than for Contributions due pursuant to a Collective Bargaining Agreement."

80. The Pension Plan defines Employee" as one "on whose behalf payments are required to be made to the Trust Fund by the Employer[.]"

## COUNT I

### Order to Modify/Vacate the Arbitration Pursuant to 29 U.S.C. § 1401(b)(2)

81. Bulk repeats and realleges the foregoing allegations as if set forth herein.

82. Pursuant to 29 U.S.C. § 186(c)(5)(B), a written agreement must set forth the detailed basis for contributions and any contributions must be made in accordance with a written agreement.

83. One of the primary purposes of 29 U.S.C. § 186 is to prevent the corruption of the collective bargaining process through the use and possible abuse by union officials of the power they might achieve if trust funds were left to their sole control.

84. Bulk paid the contributions at issue here under direct threat of union officials using their power to go on strike, and to compel Bulk to apply a contract to work specifically excluded under the written terms of that agreement.

85. As noted by the Arbitrator in his Second Interim Ruling, "Notwithstanding the evidence of bargaining history and the language of those collective bargaining agreements, the record left no dispute regarding the fact that **the Union insisted** on [Bulk] … continuing to make contributions to the Fund for the LISCO work under the terms of the Steel Mill Addendum," and "[t]he record was equally clear that [Bulk] **agreed to those demands** and do so for an extended period of time."

86. Thus, on the evidence before him, the Arbitrator found that Bulk merely acquiesced to Union pressure to make contributions that were manifestly not in accordance with the written agreement between the parties.

87. In making the rulings in the Interim Award and the Second Interim Award, the Arbitrator effectively ignored the clear statutory language, and allowed compelled conduct to overcome the written contribution obligation, which did not cover "commodities hauling."

88. The Arbitrator committed clear error when he ignored the stipulated issue agreed to and presented by the parties – whether the contributions came within the written terms of the Steel Mill Addendum – and instead decided to issue a ruling on an issue to which the parties had neither agreed nor sought any ruling – Bulk's supposed status as a successor.

89. The Arbitrator committed clear error when he based the Interim Award on the finding that Bulk was a "successor" to NACA, which error he acknowledged in the Second Interim Award.

90. The Arbitrator committed clear error when he based the Interim Award on the finding that Bulk supposedly had assumed the NACA contract, as there was a complete absence of evidence to support such a ruling.

91. The Arbitrator committed clear error in the Interim Award when he found that, whether a successor or not, Bulk had supposedly "adopted" through conduct the provisions of the Steel Mill Addendum, "whether or not those collective bargaining agreements applied by their terms to the LISCO work."

92. The Arbitrator committed clear error in the Interim Award and Second Interim Award when he held that the Steel Mill Addendum, which did not cover commodities hauling, nonetheless provided the required detailed basis for contributions for the LISCO work.

93. The Arbitrator committed clear error when he found in the Interim Award and the Second Interim Award, that Bulk had adopted by conduct the Steel Mill Addendum, even though the written terms of that agreement clearly excluded such contributions.

94. The Arbitrator committed clear error in the Interim Award and the Second Interim Award when he found that conduct can overcome the written words of an agreement, and that parties can adopt through conduct an agreement that does not apply to work by its own written terms.

95. The Arbitrator committed clear error in ignoring the provisions of the Fund's own plan documents, the Pension Plan and Trust Agreement, as set forth above in paragraphs 76-80.

96. The Arbitrator committed clear error in ignoring the specific provision of the Trust Agreement stating that "no Contributing Employer shall be liable for any payments to the Trust Fund other than for Contributions due pursuant to a Collective Bargaining Agreement."

97. The Arbitrator committed clear error in finding that the Union and Bulk could, and did, overcome through conduct the clear specific written terms of their collective bargaining agreement.

98. The Interim Award and Second Interim Award contradict 29 U.S.C. § 186(c)(5)(B) and would allow a written agreement that by its terms applies only to certain specified work to provide the detailed basis on which contributions are to be made for other work not so specified by the written terms of the agreement.

99. In accordance with the stipulation of the parties and the Arbitrator's Consent Order, the Court's decision on whether the Steel Mill Addendum provided the detailed basis for contributions for the LISCO work pursuant to 29 U.S.C. § 186(c)(5)(B) is outcome determinative as to whether Bulk owes the withdrawal liability assessed by the Fund.

100. Bulk made full payment of all assessed withdrawal liability; the payments towards withdrawal liability totaled $2,327,654.55. Bulk is entitled to that amount, with interest as established by 29 C.F.R. § 4219.31(d).

WHEREFORE, Plaintiff Bulk demands that the Arbitrator's rulings in the Interim Award and Second Interim Award be vacated, and that an Order be entered:

A. Granting judgment in Bulk's favor on the withdrawal liability assessments at issue;

B. Ordering the Defendants to return all amounts paid by Bulk, with interest; and to pay costs and expenses as set forth in 29 U.S.C. § 1451(e); and

C. Granting such other and further relief as the Court may deem just.

Dated:  December 21, 2021

Respectfully submitted,

/s/ Mark M. Trapp
Mark M. Trapp
CONN MACIEL CAREY LLP
53 W. Jackson Blvd.
Suite 1328
Chicago, IL 60604
(312) 809-8122
mtrapp@connmaciel.com

*Counsel for Plaintiff Bulk Transport Corp.*