UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BULK TRANSPORT CORP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 2:21CV399-PPS/JPK |
| ) | |
| TEAMSTERS UNION NO. 142 PENSION ) | |
| FUND and TRUSTEES OF THE ) | |
| TEAMSTERS UNION NO. 142 ) | |
| PENSION FUND, ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Bulk Transport Corp has a fleet of tractors and trailers that transport machinery and general freight. After years of relationship with the Teamsters Union, Bulk brings this action to challenge the ruling of an arbitrator that Bulk is liable for approximately $2.3 million in withdrawal liability due to certain pension contributions it made under a collective bargaining agreement with Teamsters Local 142. Even though the terms of the CBA plainly did not cover the work in question, the arbitrator ruled that Bulk was on the hook because, through its conduct, Bulk adopted the CBA. Bulk paid the sum owed and now seeks its return claiming the arbitrator was incorrect in his conclusion.

Now before me are cross-motions for summary judgment. The parties largely agree on the relevant facts, and suggest that the matter turns on questions of law, and whether the Arbitrator erred in applying the law to the facts of their dispute. I find that he did not.

## **The Standard of Review**

Applicable federal law provides that "[u]pon completion of the arbitration proceedings in favor of one of the parties, any party thereto may bring an action...in an appropriate Unites States district court in accordance with section 1451 of this title to enforce, vacate, or modify the arbitrator's award." 29 U.S.C. §1401(b)(2). In addition, "[i]n any proceeding under subsection (b), there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." §1401(c).

In 1989, the Seventh Circuit considered the standard of review of an arbitrator's award in a withdrawal liability context, and held: "Like every other federal appellate court which has addressed this question, we hold that district courts may fully review the arbitrator's legal determinations." *Trustees of Iron Workers Local 473 Pension Trust v. Allied Productions Corp.*, 872 F.2d 208, 211 (7th Cir. 1989). *See also Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 805 (7th Cir. 1999); *Central States, etc. v. Sherwin-Williams Company*, 71 F.3d 1338, 1340 (7th Cir. 1995). By contrast, an arbitrator's determinations of fact, and application of law to fact, are both subject to being set aside on judicial review only if clearly erroneous. *Central States, etc. v. Nitehawk Express, Inc.*, 223 F.3d 483, 488 (7th Cir. 2000); *Midwest Motor Express*, 181 F.3d at 804-05; *Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan*, 3 F.3d 994, 999 (7th Cir. 1993) (interpreting 29 U.S.C. §1401(c)).

The immediate procedural context of this decision is the parties' cross-motions for summary judgment.  Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  As mentioned, the material facts presented by the parties in support of their cross-motions for summary judgment are largely undisputed.

### Undisputed Facts

Bulk Transport Corp is an "employer" within the meaning of 29 U.S.C. §1451(a)(1).  [DE 28 at ¶4.]  The Teamsters Union No. 142 Pension Fund is an "employee pension benefit plan" as defined in 29 U.S.C. §1002(2)(A).  [*Id*. at ¶5.]  The Fund is a multi-employer plan within the meaning of 29 U.S.C. §1002(37) and 29 U.S.C. §1301(a)(3).  [*Id*. at ¶6.]

The Pension Fund was established and is maintained by employers engaged in commerce or in an industry affecting commerce and by an employee organization representing employees engaged in commerce or in an industry affecting commerce within the meaning of 29 U.S.C. §1003(a).  [*Id*. at ¶7.]  The Trustees are fiduciaries of the Fund under 29 U.S.C. §1002(21)(A) and the plan sponsor of the Fund under 29 U.S.C. §1301(a)(10).  [*Id*. at ¶8.]

The Fund is governed by a "Restated Agreement and Declaration of Trust," which includes a provision stating: "Except as otherwise required by law, no Contributing Employer shall be liable for any payments to the Trust Fund other than for Contributions due pursuant to a Collective Bargaining Agreement or other

3

payments required under the terms of this Restated Agreement and Declaration of Trust." [DE 31 at ¶3, quoting DE 11 at 262.] Bulk has had a long term relationship with the Teamsters, and, as a consequence, has contributed to the Pension Fund for several decades. [*Id*. at ¶5.]

From 2000-2003, Bulk was a signatory to two separate collective bargaining agreements with Teamsters Local 142. [DE 28 at ¶9.] First there was the "Construction Agreement" which covered three types of construction driving work: building construction, highway construction and heavy construction.[1] [*Id*. at ¶10.] On August 28, 2003, Bulk signed a new 2003-2006 Construction Agreement. With its wording unchanged from the 2000-2003 agreement, the new Construction Agreement continued to cover only the three specified types of construction driving work. [*Id*. at ¶12, ¶23.]

The other collective bargaining agreement, known as the "Steel Mill Addendum," covered four types of non-construction driving work: steel mill work, driving to the Port of Indiana, driving for warehouse deliveries, and commodities hauling.[2] [*Id*. at ¶11.] During negotiations in 2003 over a new Steel Mill Addendum, the Union initially proposed to expand the definition of "steel mill work" by adding language to the end of the definition such that it would encompass all non-construction

---

[1] For ease of reference I have simplified the name of the agreement. The full name is actually: "The Articles of Agreement for General Construction of Building, Heavy and Highway Projects." [DE 31 at ¶8.]

[2] Again, more fully, "The Steel Mill Operation Addendum to the Articles of Agreement for General Construction of Building, Heavy & Highway Projects." [DE 31 at ¶18.]

4

"driving performed by covered employees to fulfill the company's contractual obligation to any steel mill *(or any other non-construction work assigned to the employee by the employer)*." (Emphasis added.)  [*Id*. at ¶13.]

Ultimately Bulk and the Union specifically agreed to exclude commodities hauling work from the new Steel Mill Addendum, and expressed the limits of the Steel Mill Addendum by stating in the first paragraph, in bold underlined letters, that it would apply to "**Steel Mill Operation Work only**." [*Id*. at ¶¶14, 15, 16 (emphasis in original).]  The Steel Mill Addendum defined "steel mill operation work" as all non-construction work "performed by Employees for the Employer to fulfill the Employer's contractual obligations to any steel mill." [*Id*. at ¶17.]  Provisions in the 2003-2006 Construction Agreement regarding contributions to the Fund applied to work performed under the 2003-2006 Steel Mill Addendum via an adoption provision in the Addendum.  [DE 31 at ¶31.]

Bulk and the Union executed the new Steel Mill Addendum in October 2003. [DE 28 at ¶18.]  Following the 2003 negotiations, Bulk repeatedly tried to negotiate a contract to cover commodities hauling work, but the Union refused to engage in such negotiations.  [*Id*. at ¶26.]

In 2004, Bulk entered into a contract with the Levy Indiana Slag Company ("LISCO") to perform a big job involving commodities hauling.  [*Id*. at ¶28.]  Bulk and the Union have stipulated that the Construction Agreement was not applicable to this LISCO work and that LISCO was not a steel mill.  [*Id*. at ¶¶29, 30.] Put another way, the

5

LISCO work was performed by Bulk employees to fulfill Bulk's contractual obligations to LISCO, but not to fulfill any contractual obligation of Bulk to any steel mill. [*Id.* at ¶¶31, 32.]

Bulk and the Union agree that the LISCO work had previously been performed by another entity, NACA Trucking. [*Id.* at ¶33.] NACA had its own contract with LISCO, which Bulk did not adopt when it got the LISCO work; instead, it negotiated its own deal with LISCO. [*Id.* at ¶34.] NACA and Bulk are entirely separate entities; they had different owners, different equipment, different facilities and a different location. [*Id.* at ¶36.] In other words, Bulk was not a subcontractor and is not affiliated with NACA in any way. [*Id.* at ¶¶35, 36.] Everyone agrees that Bulk did not assume any contract NACA had with LISCO. [*Id.* at ¶39.] Bulk began performing the LISCO work on April 17, 2004. [*Id.* at ¶40.] In May of 2004, Bulk supplemented its workforce performing the LISCO work by hiring some of the drivers previously employed by NACA. [*Id.* at ¶41.]

Bulk repeatedly reached out to the Union to attempt to negotiate a new contract covering the LISCO work, but the Union refused to negotiate any agreement to cover "commodities hauling," and instead told Bulk to apply the Steel Mill Addendum to the LISCO work. [*Id.* at ¶¶43, 44.] The Union does not dispute that the text of the Steel Mill Addendum did not cover commodities hauling. [*Id.* at ¶43.] According to Debra Jones, Bulk's negotiator with the Union, the Union had a better deal under the Steel Mill Addendum than it had with NACA, and that is why the Union sought to apply the

6

Steel Mill Addendum to the LISCO work. [*See* Record of the Arbitration, DE 11 at 562, ¶22].

Whatever its motivation, the Union felt strongly about its position telling Bulk that if it did not apply the Steel Mill Addendum to the LISCO work, or implemented any other terms and conditions of employment, it would strike. [DE 28 at ¶51.] Instead of bringing an unfair labor charge against the Union, Bulk simply acquiesced and continued to apply the terms of the Steel Mill Addendum to the LISCO work, even though the text of that agreement excluded that work. [*Id*. at ¶53.]

Bulk paid employees performing the LISCO work the wage rate called for in the 2003-2006 Steel Mill Addendum. [DE 31 at ¶43.] For the LISCO work, Bulk was contributing $3.50 per employee per hour to the Fund, precisely as the 2003-2006 Construction Agreement (and, via its adoption provision, the 2003-2006 Steel Mill Addendum) demanded. [*Id*. at ¶44.] Bulk contributed and paid wages at these rates from the outset of the LISCO work in May 2004. [*Id*. at ¶65.] Bulk has never asked for a return of the contributions it made for the LISCO work. [*Id*. at ¶62.]

As time went by the Union occasionally expressed a willingness to enter into a commodities hauling contract, but its preference was for Bulk to apply the Steel Mill Addendum to the LISCO work. [*Id*. at ¶¶55, 56.] And that's just what Bulk did. [*Id*. at ¶53.] Eventually, after a meeting between Bulk and the Union in April 2005, the Union sent Ms. Jones (Bulk's negotiator) a letter reaffirming its position that "we have a current Contract and Addendum in place and that Bulk . . . should abide by it." [DE 11

7

at 231.] Bulk continued to insist that the Steel Mill Addendum was not applicable to the LISCO work, and again requested to negotiate a written contract to cover that work, but the Union refused. [DE 28 at ¶58.]

Finally, in approximately August of 2005, another union engaged in a strike against The Levy Company, an affiliate of LISCO. The Union honored the picket lines which resulted in Bulk losing the LISCO work. [*Id.* at ¶59.]

According to the Pension Fund, the pension contributions Bulk made for the employees performing the LISCO work dramatically increased Bulk's "contribution base units" in the period during which such contributions were made. [*Id.* at ¶61.] Those contributions later provided the basis for the Fund's calculation of withdrawal liability against Bulk. [*Id.* at ¶62.] After Bulk lost the LISCO work and its contributions subsequently dipped, the decline in contribution base units provided the basis for the Fund's assertion of withdrawal liability. [*Id.* at ¶63.]

In February 2012, the Fund issued Bulk three assessments for partial withdrawal liability—$954,355 for 2009, $30,393 for 2010 and $951,937 for 2011. [*Id.* at ¶64.] On May 15, 2012, Bulk filed a timely request for review challenging those assessments, and after receiving no response from the Fund, initiated arbitration on November 9, 2012. [*Id.* at ¶¶65, 66.] The Fund later cancelled the 2009 assessment and issued revised assessments for partial withdrawal liability—$924,061 for 2010, $941,553 for 2011, and $162,725 for 2012. [*Id.* at ¶67.] The Fund refunded over $352,000 to Bulk, representing the amount Bulk had paid pursuant to the original assessments, with interest. [*Id.* at ¶68.]

**The Arbitration**

The parties proceeded to arbitration in early 2013 over the revised assessments. [*Id*. at ¶69.] For a variety of reasons, some that make sense and some that don't, the arbitration did not come to a conclusion for nearly *nine years* when the Arbitrator issued his final consent order in the case in November 2021. [DE 1-5.]

Here's what happened in the arbitration. On June 20, 2013, Bulk and the Fund agreed, and informed the Arbitrator, that they "would benefit from a ruling on the legal issue of whether the Steel Mill Addendum covers the LISCO work performed in 2004-2006 utilized to calculate the withdrawal liability assessment." [DE 28 at ¶84, quoting DE 11 at 329.] After a conference with the Arbitrator on July 29, 2013, the Arbitrator summarized the parties' positions: "there was no dispute that the contributions were, in fact, made to the Fund by [Bulk]. What is disputed is whether those contributions were required by the applicable collective bargaining agreement." [*Id*. at ¶91, quoting DE 11 at 350.] The parties agree that at no point in the July 29, 2013 conference did the parties or the Arbitrator raise Bulk's supposed status as a successor to NACA, and the Arbitrator did not ask the parties to brief the issue of successorship. [DE 28 at¶¶93, 94.]

Nevertheless, in his initial Interim Award issued on October 3, 2014, the Arbitrator went in a different direction than what the parties anticipated. He said that, regardless of whether the Addendum's language actually covered the work (and it plainly didn't), there were "two reasons why the record supports a finding" why the LISCO work should be included in the determination of withdrawal liability. [DE 11 at

9

527.] The first reason was the successor theory, which the Arbitrator explained this way. "[O]nce the Employer acknowledged that it was a successor employer to NACA and was under a duty to bargain with Local 142 regarding the wages, hours and terms and conditions of employment of the LISCO contract employees, the Employer was no longer free under the [NLRA] to change those wages and terms and conditions of employment" unless and until one of several conditions subsequent occurred (and none did). [DE 11 at 527-528.]

The second reason—the adoption theory—was later set out by the Arbitrator:

> No assertion may be made that the lack of a signed collective bargaining agreement covering the LISCO work violated the written agreement requirements of Section 302(c)(5) of the LMRA, 29 U.S.C. §186(c)(5). By adopting the same contribution provisions that are set forth in the signed collective bargaining agreements that the Employer did execute with the Union, it is clear that the detailed basis upon which contributions were to be made was contained in a written agreement. The Employer adopted those provisions and used them as the basis for making contributions for the LISCO work whether or not those collective bargaining agreements applied by their terms to the LISCO work.

[DE 11 at 530.]

Curiously, without making a further reference to the adoption theory, here's how the Arbitrator recapped his decision: "In sum, whether or not the language of the Steel Mill Addendum and/or the Construction Agreement applied to the LISCO work, it is clear that the Employer was obligated to make those contributions beginning at least as of the date that the Employer *became the successor* to NACA with respect to that

10

work." [DE 11 at 531] (emphasis added.) In other words, the Arbitrator's conclusion only stated the successor liability theory, not the "adoption by conduct" theory.

The Arbitrator's analysis about successor liability certainly came as a unwelcome surprise to Bulk, which then promptly moved for reconsideration on October 22, 2014. The parties now agree that "Plaintiff's successor status was not the issue presented to the Arbitrator." [DE 28 at ¶113 Response.]

The parties' submissions on reconsideration concluded mid-September 2015. The Arbitrator's reconsideration decision was issued on February 23, 2017. The opinion denying Bulk's motion for reconsideration expressly incorporates the Interim Award by reference. [DE 11 at 595.] The Arbitrator acknowledged that Bulk's motion for reconsideration challenging reliance on the successor theory "is based upon its assertion that the Award was upon a matter not submitted to the Arbitrator for ruling and that the matter affected the merits of the decision." [DE 11 at 609.] The Arbitrator nonetheless reaffirmed his conclusion: "After careful consideration, I find that no basis for reconsideration of the Award has been shown, but that even if it is assumed <u>arguendo</u> that the initial Award was upon a matter not submitted to the Arbitrator, the initial Award must be reaffirmed." [DE 11 at 609.] This was because, even if he was incorrect on the successor liability theory, the Arbitrator held that the "second, independent ground" still held water—that second ground being "that the Employer by its conduct adopted the contribution requirements of the Steel Mill Addendum and/or the Construction Agreement as applicable to the LISCO work." [DE 11 at 611.]

11

In its briefing, the Fund still disputes whether the Arbitrator conclusively recanted the successor theory, arguing that he "could have changed his ultimate successorship conclusion, but did not." [DE 28 at ¶124 Response.] But that reading is entirely implausible given what the Arbitrator said:

> While the new information would affect the conclusion that the Employer was a successor to NACA, it would not affect the second, independent basis for the Award that the actions of the Employer and the Union constituted an adoption by the Employer of the Steel Mill Addendum's requirement that contributions be made to the Fund on behalf of the LISCO work.

[DE 11 at 612.] The Fund says the phrase "would affect the conclusion" means merely that "the new information was relevant to that conclusion." [DE 28 at ¶124 Response.] That doesn't seem a reasonable reading to me. I think the fairer interpretation of the opinion is that there was no need for reconsideration because, even though the successor theory was deemed incorrect, the other theory relied on by the Arbitrator (the adoption theory) was left undisturbed. In other words, there was no need to reconsider the suspenders (the successor theory) because the belt (the adoption theory) was still holding the pants up. More importantly, I asked counsel for the Union at oral argument whether he was relying on the successor liability theory any longer, and he told me he was not. So no further discussion of the successor liability theory is necessary.

After the Arbitrator's ruling on the motion to reconsider was issued, the parties agreed to keep the arbitration in abeyance before the Arbitrator. [*Id.* at ¶127.] During the period of abeyance, as it had from the beginning, Bulk continued making all required payments of withdrawal liability under the three assessments. [*Id.* at ¶128.]

12

Over the course of time, Bulk paid the full amount of each assessment—$2,327,654.55 in total. [*Id*. at ¶¶128, 129.]

Eventually, the parties agreed to forgo pursuit of certain additional issues, entered into certain stipulations, and requested that the Arbitrator enter a consent order to bring the arbitration to a close. [*Id*. at ¶130.] As part of the consent order, the parties stipulated that: "On appeal, the court's determination as to the legal issues (whether affirmed or reversed) would be outcome determinative as to whether Bulk owes the withdrawal liability assessments at issue in the Arbitration." [*Id*. at ¶132, quoting DE 11 at 432.] The parties signed, and on November 24, 2021 the Arbitrator entered, the Consent Order as his final order in the arbitration. [*Id*. at ¶133.]

## Discussion

The question presented is whether the Arbitrator was incorrect in basing the Interim Award on the adoption theory—i.e. that by its conduct Bulk had adopted the provisions of the Steel Mill Addendum as applicable to the LISCO commodities hauling work, even though the written terms of the agreement clearly excluded that work.

The Fund concedes that the language of the Steel Mill Addendum does not by its terms apply to the LISCO commodities hauling work. [DE 28 at ¶43 Response.] But the Fund defends the Arbitrator's conclusion that Bulk adopted the Addendum for the LISCO work by agreeing to its application. The Fund tells me that the Addendum's coverage is a legal question, and that the Addendum "could (and did) extend to work not set forth in its text through adoption." [DE 28 at ¶20.] But the Fund also maintains

13

that, even though "the text of the Addendum did not cover commodities hauling," it is a question of fact, subject to judicial reversal only if clearly erroneous, that "Plaintiff adopted the Addendum to the commodities hauling at issue here," the LISCO work. [*Id.* at ¶43.]

The Seventh Circuit has long since recognized that collective bargaining agreements (in contrast to ERISA plans) "can be modified by subsequent dealings that give rise to an inference that the parties agreed, even if just tacitly, to the modification[.]" *Orth v. Wisconsin State Employees Union Counsel 24*, 546 F.3d 868, 872 (7th Cir. 2008). In *Orth*, the court, with Judge Posner writing, observed that collective bargaining agreements "can be and often are modified by a subsequent nonwritten agreement – whether express (and therefore oral) or tacit (and therefore evidenced by subsequent dealings) – between the union and the employer." *Id.* at 873. Indeed, the Seventh Circuit has specifically held that "parties to a CBA may tacitly acquiesce to an amendment of the agreement through their course of dealing." *Matuszak v. Torrington Co.*, 927 F.2d 320, 324 (7th Cir. 1991). *See also Maples v. Illinois Bell Telephone Co.*, 594 F.Supp.2d 937, 943 (N.D.Ill. 2009) ("[i]t is well-established in labor law that a particular custom or practice can become an implied term of a labor agreement through a period of acquiescence"). In a nutshell, on the facts of the course of dealing between Bulk and the Union, this principle applies here and supports affirmance of the Arbitrator's decision.

The Seventh Circuit has described this as a "well-established principle" — "that a collective bargaining agreement is not dependent on the reduction to writing of the parties' intention to be bound," but rather "[a]ll that is required is conduct manifesting an intention to abide and be bound by the terms of an agreement.'" *Bricklayers Local 21 of Illinois Apprenticeship and Training Program v. Banner Restoration, Incorporated*, 385 F.3d 761, 766 (7th Cir. 2004), quoting *Gariup v. Birchler Ceiling & Interior Co.*, 777 F.2d 370, 373 (7th Cir. 1985), and citing other collected cases. "Prior cases that have held an employer bound to a collective bargaining agreement as a result of conduct have emphasized, among other factors, the payment of union wages, the remission of union dues, the payment of fringe benefit contributions, the existence of other agreements evidencing assent and the submission of the employer to union jurisdiction, such as that created by grievance procedures." *Bricklayers Local 21*, 385 F.3d at 766.

In the present case, Bulk does not dispute that it applied the terms of the Steel Mill Addendum to the LISCO work, including paying its employees the wage rate specified in the 2003-2006 Steel Mill Addendum and making contributions to the Fund precisely as the Addendum required. Bulk paid those wages and made those ERISA fund contributions from the outset of the LISCO work and never asked for the contributions to be returned. This conduct evidences an acquiescence in the Union's direction to Bulk that it should apply the Steel Mill Addendum to the LISCO work.

It is true that Bulk continued to express its objections to application of the Steel Mill Addendum and repeatedly requested to negotiate a new contract expressly

15

covering commodities hauling work such as that performed for LISCO.  Bulk appears to believe that these facts strengthen its position against the Fund, but I see them as tugging in the opposite direction.  When Bulk capitulated to the Union's insistence on applying the Steel Mill Memorandum, Bulk was engaging in a decision to do so despite its awareness that the terms of the Steel Mill Memorandum did not expressly apply to the LISCO work.  The overall circumstances support the finding that Bulk's conduct was decisional and strategic, in that it wanted the valuable LISCO business after the prior contractor was thrown off the job.  Bulk capitulated to the Union's demands that the Steel Mill Addendum be applied, and caved to the Union's threats of a strike if Bulk insisted on other terms, because Bulk wanted the work, and acceded to the Union's position full well knowing that the Addendum's language did not otherwise apply.

      Bulk cannot have it both ways:  getting the presumably profitable LISCO work and avoiding a strike by knowingly making ERISA contributions in conformity with the Steel Mill Addendum, but later avoiding withdrawal liability calculated on the basis of those contributions which it knowingly and voluntarily paid.  In *Robbins v. Lynch*, 836 F.2d 330, 332-333 (7th Cir. 1988), an employer who had not signed a CBA was nonetheless bound when it complied by paying union wages and ERISA fund contributions, and the fact that the compliance was motivated by the union's threat of strike made no difference. "The threat to strike is unexceptional.  Unions frequently decline to work unless the employer adheres to a collective bargaining agreement," and the threat "hardly makes adherence to the agreement involuntary."  *Id*. at 333.

16

Case law holding that an employer cannot *evade* ERISA contribution liability by a side agreement with a union NOT to apply an applicable writing don't govern here where a different scenario is presented. *See, e.g., Central States, etc. v. Auffenberg Ford, Inc.*, 637 F.3d 718, 721(7th Cir. 2011); *Central States, etc. v. Joe McClelland, Inc.*, 23 F.3d 1256, 1258 (7th Cir. 1994); *Central States, etc. v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1154 (7th Cir. 1989). Such cases do not speak to whether an employer can *create* an obligation concerning ERISA contributions by its conduct in treating a writing as applicable and making such contributions where the writing itself would not require the employer to do so. Paying when a writing does not require payment does not "contradict" the writing in the same manner as *not* paying when the writing requires payment.

An employer who claimed to have paid ERISA contributions by mistake after failing to sign a successor CBA with higher rates was bound by its conduct, which in effect agreed to the modification. *Operating Engineers Local 139 Health Benefit Fund v. Gustafson Construction Corporation*, 258 F.3d 645, 649 (7th Cir. 2001). The Seventh Circuit explained: "Nothing in the law of contracts requires that a contract, whether original or modified, must be signed to be enforceable. The contract needn't be in writing; if it is in writing, it needn't be signed, provided there's other evidence of acceptance, for example (a very pertinent example) by performance." *Id*. Here, as in *Gustafson*, there existed a writing that specified the wage and contribution rates – the Steel Mill Addendum – and "the issue here is not oral modification" but whether the employer

17

accepted application of the written terms, which "can be manifested by conduct as well as by words." *Id*. at 650.

*Line Construction Benefit Fund ("Lineco") v. Allied Electrical Contractors, Inc.*, 591 F.3d 576, 578 (7th Cir. 2010), is another case in which the Seventh Circuit held that an electrical contractor's "course of conduct – making payments precisely in accordance with the 2005 CBA from the start – demonstrates its assent to that agreement," despite not having signed onto that new collective bargaining agreement. The court cited the holding of *Bricklayers Local 21* in concluding that "[a]ssent can...be established through other evidence, including most importantly conduct manifesting agreement," such as by paying union wages and paying union fringe benefit contributions. *Lineco*, 591 F.3d at 580, quoting *Bricklayers Local 21*, 385 F.3d at 766. As in *Gustafson* and *Gariup*, the existence of a writing describing the contributions actually being made "serves as the written agreement, and it is enough" for the LMRA and its writing requirement found in 29 U.S.C. §186(c)(5)(B). *Lineco*, 591 F.3d at 581. "As long as the agreement is written, it does not have to be 'a signed, unexpired collective bargaining agreement between the parties,' ... or even a signed agreement at all." *Id.,* quoting *Gariup*, 777 F.2d at 375.

At the eleventh hour with my opinion near completion, Bulk has filed a memorandum addressing what it believes is supplemental authority supporting its position. [DE 35.] Bulk cites language from *Central States, etc. v. Transervice Logistics, Inc.*, 56 F.4th 516 (7th Cir. 2022), that Bulk contends supports reliance on the terms of agreements alone to determine an employer's contribution liability. But *Transervice*

18

arises in an entirely different context – interpreting "evergreen clause" language governing the termination of CBA's. The overarching concern repeatedly underscored in *Transervice* is ERISA's purpose of "protect[ing] employee benefit funds against uncertainty and employees against loss of benefits." *Id.* at 524. That purpose is served here by imposing on Bulk the withdrawal liability consistent with its conduct that treated the CBA as applicable to the LISCO work.

*Transervice* supports interpreting a contract in favor of the fund and its expectations: "a third-party beneficiary such as the plaintiff fund must make decisions based on the conduct of the parties to the contract...." *Id*. at 525. The Fund aptly points out that the Seventh Circuit has warned against interpreting CBA's formalistically, creating loopholes that permit an employer to avoid contribution liability: "we have held repeatedly that conduct manifesting assent creates an obligation; a contrary rule would ignore commercial realities and would create a loophole for parties seeking to escape responsibilities that they have acknowledged through their behavior." *Lineco*, 591 F.3d at 581.

My analysis results in judgment for the Fund, affirming the Arbitrator's decision that Bulk is liable for the withdrawal liability assessments, because by its conduct Bulk adopted the Steel Mill Addendum as applicable to the LISCO work. This is so whether my conclusions result from a *de novo* review of matters of law, or a deferential clear error standard of review of the application of law to fact. Summary judgment will be

19

entered in favor of the Fund and against Bulk on its complaint seeking to vacate the Arbitrator's awards.

**ACCORDINGLY:**

Plaintiff Bulk Transport Corp.'s Motion for Summary Judgment [DE 22] is DENIED.

The Motion for Summary Judgment of defendants Teamsters Union No. 142 Pension Fund and Trustees of the Teamsters Union No. 142 Pension Fund [DE 16] is GRANTED.

The Clerk shall enter summary judgment in favor of defendants and against plaintiff for the reasons set forth in this opinion.

**SO ORDERED**.

ENTERED: March 8, 2023.

                                          /s/ Philip P. Simon
                                         PHILIP P. SIMON, JUDGE
                                         UNITED STATES DISTRICT COURT